DUNN et al. v. TAYLOR et al. †

(Court of Civil Appeals of Texas. San Antonio. Jan. 3, 1912. Rehearing Denied Jan. 24, 1912.)

1. ACKNOWLEDGMENT (§ 55*)—CONCLUSIVENESS—CONTRADICTING CERTIFICATE.

A certificate of acknowledgment of a deed of a woman which recites that she is the wife of a person named may be contradicted by the testimony of the alleged husband that the woman is not his wife.

[Ed. Note.—For other cases, see Acknowledgment, Cent. Dig. §§ 303–315; Dec. Dig. § 55.*]

2. APPEAL AND ERROR (§ 1097*)—LAW OF THE CASE—DECISIONS OF THE SUPREME COURT.

A decision of the Supreme Court on writ of error to review a decision of the Court of Civil Appeals is conclusive on the Court of Civil Appeals on a subsequent appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4358–4368; Dec. Dig. § 1097.*]

3. APPEAL AND ERROR (§ 739*)—ASSIGNMENT OF ERROR—SUFFICIENCY.

An assignment of error that the court in trespass to try title erred by leaving it to the jury to determine whether the breaks in possession and delays in recording deeds in the chain of title were reasonable, no testimony being offered on either of the issues, is not objectionable as submitting two distinct propositions of law, where the charge complained of so blended the issues as to make them inseparable in their submission.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3034–3036; Dec. Dig. § 739.*]

4. TRIAL (§ 256*)—INSTRUCTIONS—REQUESTS—NECESSITY.

The error in an instruction in trespass to try title on the issue of adverse possession relied on by a party that if the party and those under whom he claims have had peaceable and adverse possession for five years, and if there were suspensions in the actual occupancy of the land or delays in recording the deeds in the chain of title, the jury must determine whether the suspensions and delays were reasonable, and if unreasonable the adverse possession was broken, arising from a failure to define what constitutes a reasonable or unreasonable length of time, is not fundamental, and, in the absence of a request for a special charge correcting the error, the defeated party may not complain.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 628–641; Dec. Dig. § 256.*]

5. ADVERSE POSSESSION (§ 43*)—ACTS CONSTITUTING.

Adverse possession under deeds duly recorded, to constitute title under the five-year statute of limitations, need not be continued in the same person, but, when held by different persons successively, there must be a privity of

estate between them, and they must successively acquire the interest claimed, and a suit must be brought within five years to recover the land against one holding by peaceable and adverse possession, cultivating and enjoying the same and paying taxes thereon, and claiming under deeds duly recorded.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 213–225; Dec. Dig. § 43.*]

6. ADVERSE POSSESSION (§ 43*)—ACTS CONSTITUTING—BREAKS IN POSSESSION.

Where a possessor sells his land and remains in possession claiming it, he breaks the possession essential to establish title by adverse possession.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 213–225; Dec. Dig. § 43.*]

7. ADVERSE POSSESSION (§ 82*)—ACTS CONSTITUTING—BREAKS IN POSSESSION.

Where a deed in the chain of title under which one claims title by adverse possession under the five-year statute of limitations has not been duly recorded, the possession essential to constitute title by adverse possession is broken.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 468–471; Dec. Dig. § 82.*]

8. APPEAL AND ERROR (§ 1066*)—HARMLESS ERROR—ERRONEOUS INSTRUCTIONS.

Where, in trespass to try title relying on adverse possession under deeds duly recorded, there was no evidence of unreasonable delays in recording the deeds, the error, if any, in an instruction submitting the issue of reasonable or unreasonable delay in recording the deeds, was harmless.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4220; Dec. Dig. § 1066.*]

9. ADVERSE POSSESSION (§ 116*)—DELAYS IN RECORDING DEEDS IN CHAIN OF TITLE—EVIDENCE—INSTRUCTIONS.

Where a party in trespass to try title relying on adverse possession under recorded deeds introduced evidence explaining the dates of the deeds, and the homes of the parties and the surrounding circumstances, a charge submitting the issue whether delays in recording the deeds were reasonable or unreasonable was proper.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. § 66; Dec. Dig. § 116.*]

10. ADVERSE POSSESSION (§ 85*)—EVIDENCE—SUFFICIENCY.

Evidence held to justify a finding of acquisition of title by adverse possession under recorded deeds.

[Ed. Note.—For other cases, see Adverse Possession, Dec. Dig. § 85.*]

11. ADVERSE POSSESSION (§ 19*)—INCLOSURE.

Where the deeds under which a party claimed title under the five-year statute of limitations defined the boundaries, a fence embracing more land than the field notes called for, used as a boundary fence by permission or otherwise sufficient to hold stock, was a sufficient barrier to show possession of the land to ripen into title by adverse possession, in the absence of some adverse possession of a part of it by some one asserting a superior title.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 99–105; Dec. Dig. § 19.*]

12. TRIAL (§ 327*)—VERDICT—SUFFICIENCY—DISPOSAL OF ALL ISSUES.

Where the verdict in trespass to try title awarded recovery of the land to various parties to the suit, by name and in quantities spec-

ified, an objection on appeal that the directed verdict was defective for failure to dispose of certain other parties not therein mentioned is untenable, where the court charged that such other parties could not recover, and that the verdict must be against them and in favor of whoever might recover, which charge was given effect by the judgment entered.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 768½–770; Dec. Dig. § 327.*]

Appeal from District Court, Dimmit County; J. F. Mullally, Judge.

Action by Ella G. Taylor and another against Frank Dunn, in which J. V. Tackaberry intervened and by cross-action added as parties the Nueces Valley Irrigation Company and others. From a judgment for plaintiffs and some of the parties added by the cross-action, defendant Tackaberry and others appeal. Affirmed.

N. A. Rector, for appellants. A. C. Bullitt, for appellees.

COBBS, J. This suit was instituted by Ella G. Taylor and husband against Frank Dunn on the 4th day of November, 1903, to recover 640 acres of land in Dimmit county, granted to John Cummings. Dunn thereafter conveyed to J. V. Tackaberry, who intervened in the suit, and by way of cross-action added the following other parties to the suit, to wit: Nueces Valley Irrigation Company, a private corporation, W. B. Dunlap, H. D. Keith, W. W. Cunningham, and W. M. Carroll, Mrs. M. A. Haas and her husband, Chas. Haas, J. L. Zachary, H. W. Earnest, and H. C. Lane.

This cause has been before this court twice on appeal (42 Tex. Civ. App. 241, 94 S. W. 347, 107 S. W. 952), and once to the Supreme Court (102 Tex. 80, 113 S. W. 265), where all the questions originally in the case were disposed of, and finally tried on the sole issue involving the title acquired by virtue of the statute of five-year limitation. The district court instructed the jury that J. V. Tackaberry had title, unless it had been lost by the limitation of five years relied upon to defeat him. A full history and statement of this case may be found in the opinions of the court on the appeals above referred to.

Under the instruction of the court on the question of limitation, the verdict of the jury was as follows: "We, the jury, find from the evidence in this case that the parties, Ella G. Taylor and husband, J. S. Taylor, and all parties holding land under said Ella G. Taylor and husband, J. S. Taylor, as far as their interest may concern, as follows: Ella G. Taylor and husband, J. S. Taylor, 203½ acres; M. A. Haas 26½ acres; C. L. Bass 10 acres: Max Deutz 110 acres; Nueces Valley Irrigation Company, 250 acres; J. L. Zachary, 20 acres; H. C. Lane, trustee, 20 acres, of said land—have had peaceable and adverse possession by limitation for a period of five years, commencing January 1, 1893, and ending July 24, 1901, and we find our verdict in their favor accordingly." The court instructed the jury: "As to Frank Dunn, W. B. Dunlap, H. D. Keith, W. W. Cunningham, and W. W. Carroll, your verdict will be against them and in favor of whoever recovers the land."

[1] The first claimed error is, in effect, that the court erred in permitting the plaintiffs and cross-defendants to introduce J. S. Taylor as a witness to contradict the certificate of acknowledgment to the deed from M. T. Taylor to J. C. Taylor, wherein she recites that she acknowledges the same as the wife of J. S. Taylor, on the ground that it "impeached or intended to impeach the record title under which the plaintiffs and cross-defendants claimed and under which they sought to recover judgment on limitation of five years alone," and the question was duly saved by a proper bill of exception. The appellant does not cite any authority to support his position, and we therefore assume he could find none. It was not error to allow J. S. Taylor to contradict the certificate, which stated that she was his wife. The certificate of a woman that she is the wife of a certain person cannot be used in evidence to prove any certain man to be her husband. The law has provided for the celebration and perpetuation of marriages, and the manner in which marriages may be proven. It is the highest, most sacred, and most ennobling of all civil contracts, and no declaration of a woman in a certificate of acknowledgment can be of any binding force without the husband's signature to the deed, as binding upon him. And, if he was not her husband, he had the right to go on the witness stand and prove its falsity. It was contended and sought to be shown that a common-law marriage existed between them at that time. The court allowed that issue to go to the jury, under proper instructions. While the decisions of the courts have recognized such marriages for what seem to have been good and sufficient reasons, still the writer of this opinion must express the hope that the Legislature will attempt some wholesome regulation upon the subject. The facts in this case alone call for such. Here the man and woman lived together for several years, having born to them one child. In the very face of his prior acts, statements, and acknowledgments, the true relations are repudiated by him, as well as the woman in whose very hands he placed the deed, written by himself, to procure her execution and acknowledgment, not signed by him, but received and delivered to the purchaser with the acknowledgment reciting he was her husband. He at least consented to her executing the deed and it passed her title, so far as she might be bound, but the jury found he was not her

husband, and we shall, in the language of a wise statesman, "let it go at that" and overrule this assignment.

[2] The second assignment presents the claimed error of the court in permitting appellees to show that the deed from M. T. Taylor to J. S. Taylor (we presume he means J. C. Taylor) was erroneously dated September 19, 1899, instead of 1900, the date of the acknowledgment. The ground assigned and submitted by proper proposition is "that it was incompetent to impeach the record of the deed by parol evidence when the plaintiffs and cross-defendants, as in this case, were seeking to recover the land under the statute of five-year limitation." This question is not an open one, for in this case on writ of error to the Supreme Court (102 Tex. 87, 113 S. W. 268), Judge Williams, for the court, on a similar point, said: "The trial court did not err in permitting defendants to show that the deed of M. T. Taylor to E. G. Taylor, dated January 1, 1901, was in fact not executed until about the date of its acknowledgment and record, June 9, 1903." Also Patton v. Terrell, 101 Tex. 221, 105 S. W. 1115. This assignment is overruled.

The third assignment complains of the action of the court in leaving it to the jury to determine "whether or not the breaks in possession of persons in possession, or the several occupants of said premises, were reasonable or unreasonable and also submitting to the decision of the jury whether or not the delays in registering, and the consequent breaks in the continued record of deeds was reasonable or unreasonable: no testimony being offered on either of said issues." There is but one proposition under this assignment, and it is as follows: "A person claiming title to land under the statute of five-year limitation must show an adverse, continuous possession under recorded deed or deeds for five years; and if the evidence shows there are breaks in the possession, and delays in registering deeds, and no testimony is offered on either of said issues, it is error for the court to submit the question to the jury whether or not such breaks in possession and delays in registering deeds are reasonable or unreasonable." The charge of the court complained of in this assignment is: "In case you find from the evidence that plaintiff and the defendants claiming title by limitation, or any of them, and those under whom they claim, have had peaceable and adverse possession of the land they claim, under such circumstances, as hereinbefore defined, as, if continued, would mature into a title in five years, then, if there were any suspensions in the actual use or occupancy of the land, or any delays in the filing for record of the respective deeds under which they claimed and held after they received their deeds, you will determine from all the facts in evidence whether such suspensions or delays were of a reasonable or unreasonable length of time; and, if you find that any such suspension or delay was of an unreasonable length of time, then you are instructed that the adverse possession was thereby broken, and unless the whole of the period of five years of adverse possession necessary to give title by limitation expired either before or after such break in the possession and within the limits of time above stated, viz., January 1, 1893, and November 4, 1903, as to the Taylors, Haas, Deutz, and Bass, and January 1, 1903, and May 20, 1905, as to Nueces Valley Irrigation Company, Zachary and Lane, trustee, then the claim of title by limitation as to such parties, if any, has failed, and your verdict as to them, if any, will be for the intervener, Tackaberry."

[3] We are requested not to consider this third assignment, because it submits two distinct propositions of law, and appellants seem to think so, as they close the assignment with the words, "No testimony being offered on either issue." However, the charge of the court so blends the issues on this phase of the case as to make them inseparable in their submission, and it is the supposed error in the charge submitting the issues which would be fundamental error, if error, that is complained of. This same point, practically, was passed upon by the Supreme Court in this same case, on a prior appeal. See Dunn v. Taylor, 102 Tex. 85, 113 S. W. 267, in which the court said: "The burden was on the defendants to prove every fact essential to their defense. Relying on the occupancy of successive possessors, they were bound to show that such occupancy was continuous and unbroken. Overand v. Menczer, 83 Tex. 122, 18 S. W. 301; Phillipson v. Flynn, 83 Tex. 584, 19 S. W. 136. Admitting that breaks occurred, they are not in a position to ask the courts to assume that such breaks were of so short duration as not to defeat the continuity of the possession. It was incumbent on them to show the facts from which the conclusion of continuity may be deduced affirmatively. But we think the evidence affirmatively indicates, at least, that there were intervals between the possessions of Thornton and of Presnall & Blocker, and between those of the latter and of Cavender, which were too great to be disregarded as the reasonable times allowed by the law for changes of occupants. No decision of this court has ever held to be immaterial such lapses of possession as this evidence indicates. It was improper for the court to submit, as it did, to the jury the question as to reasonableness of the time. There was no evidence from which the jury could properly determine that only reasonable intervals occurred, when they could not possibly know how long those intervals were. Whether it is proper in any case, where the length of the intervals is shown, to submit such an inquiry to a jury, is not the question. It certainly is improper

to submit a question which cannot be decided upon evidence adduced. We cannot admit the right of the courts to require only 9 or 9½ years of continuous possession when the law requires 10, and this would be the effect of overlooking gaps of 6 months or a year between tenancies. Of course, we are not speaking of cases in which during such intervals other acts of dominion over the land are done upon it by the claimant. Here there was nothing of the kind so far as the evidence shows. The land, it is true, was inclosed, but inclosure without use is not sufficient. The statute requires the cultivation, use, or enjoyment of the land, and this is essential to the 'actual and visible appropriation' which constitutes adverse possession. The necessity for this continuous use of the land is not affected by difficulty in getting tenants. He who would acquire the land of another by limitation must perform the conditions under which the law permits him to do so. Excuses for nonoccupancy cannot be accepted as the equivalent of possession. It is doubtless true that the uses to which land is put may be considered in determining whether or not intervals between the occupancy of tenants were only such as may be considered as the time reasonably required for the change."

[4] The jury were not instructed what constituted a "reasonable or unreasonable length of time." Neither was there any special charge asked by appellants to correct the charge. It was not a fundamental error, yet left the jury wide scope in which they might say either one of the acts of the plaintiff, such as filing deeds for record, or in continuing possession in privity, the one occupant with the other, would break the possession.

[5] The general charge of the court, however, in other paragraphs, correctly states the law to the jury, defining what constitutes the five-year possession that gives title.

In the sixth paragraph, just preceding, the court, among other things, instructs the jury: "If you believe from the evidence (naming parties) * * * or any of them, successively, if any, have had peaceable and adverse possession of said land, as those terms are hereinbefore defined, with their deed or deeds duly recorded in Dimmit county records, cultivating, using, or enjoying the same and paying taxes thereon, for any period of five years between January 1, 1893, and November 4, 1903, as to (naming plaintiffs and parties as above), and thereby acquired title to said land under the five years statute of limitation, then you will return your verdict in their favor." In paragraph 2 of the charge the jury are told: "Peaceable and adverse possession need not be continued in the same person, but, when held by different persons successively, there must be a privity of estate between them; that is, they must successively acquire the right or interest claimed." It also instructs them that such

suit in effect shall be instituted to recover the land within five years against the person holding the same by "peaceable and adverse possession thereof, cultivating, using, and enjoying the same and paying taxes thereon, if any, and claiming under a deed or deeds duly registered."

The general charge, against which no complaint is lodged, seems to cover the statutory requirements; i.e., as to adverse possession, under deeds duly registered, use and occupation, payment of taxes. When held by "different persons successively, there must be a privity of estate between them; that is, they must successively acquire the right or interest claimed." In the general charge all the elements are submitted to the jury for their consideration, and in the seventh paragraph of the charge, complained of, the court further instructs them, "if there were any suspensions in the actual use or occupancy of the land, * * * you will determine from all the facts in evidence whether such suspension or delays were of a reasonable length of time," etc. Where there is a dispute as to possession, use, occupancy, payment of taxes, etc., especially as to succeeding occupants, privity and elements of that kind, it is a question purely of fact for the jury to pass upon the breaks, delays, and the reasonableness in that of one possessor delivering the same to the successor, and all like questions. If such were undisputed, then a question of law would arise. In this charge it was also submitted, with the suspensions in occupancy following with the words, "or any delays in the filing for record of the respective deeds under which they claimed and held after they received their deeds." These issues were of importance in this case in connection with the testimony introduced, as there was testimony explaining dates of deeds and dates of delivery for registration.

[6] It is clear when a possessor sells his land and remains in possession claiming it he breaks the possession, as was done in the case of Cocke v. T. & N. O. R. R. Co., 46 Tex. Civ. App. 366–368, 103 S. W. 407, in which our Supreme Court refused a writ of error. In that cause, being one depending upon the claim of the 10-year statute, under recorded deeds, muniments of title, the court (46 Tex. Civ. App. 366, 103 S. W. 408) said: "Plaintiff in error testified that he took possession of a portion of the land in controversy on November 4, 1891, and inclosed it and has held possession thereof continually since said date, claiming it as his property. There was other testimony corroborative of the statements of plaintiff in error as to his possession of the property, and there was also evidence tending to contradict such statements. On April 25, 1896, the executor of the estate of C. M. Allen, in whom the title of A. C. & J. K. Allen had become vested, conveyed the land in controversy to Hildegarde Cooke, the wife of plaintiff in error. This deed was filed for record April 28, 1898,

and duly recorded. On March 22, 1900, the plaintiff in error, joined by his wife, conveyed the land to T. F. Williams. This deed was filed for record February 24, 1902. There was no proof of the payment of taxes on the land by plaintiff in error." Upon these facts the court (46 Tex. Civ. App. 368, 103 S. W. 409) said: "The sale by plaintiff in error to Williams divested him of all claim or right in the property and his possession during the two years that Williams held title under his deed could not have been under a claim of title or ownership in himself, and there is no evidence that he was holding for and under Williams, nor any testimony that Williams had any possession during said time, which would inure to plaintiff in error's benefit under his subsequent purchase from Williams."

[7] It is true the law requires the very deed under which the party holds to be recorded. If one of the deeds in the chain of title has not been duly recorded, the possession would be broken. Porter v. Chronister, 58 Tex. 56; Cook v. Dennis, 61 Tex. 249.

[8] At any rate, in so far as submitting to the jury the question of the reasonableness of their registration is concerned, it would be a harmless error if, as contended, there were no proof, or rather there was not evidence, that it was an unreasonable time.

[9] But there was proof explaining the dates of the deeds. The time shown by the dates of the registration by parties, their homes, and the surrounding circumstances all can be considered by the jury. In the case of Gillum v. Fuqua, 61 S. W. 939, opinion delivered by Justice Fly, it is said: "If the deeds from Houston had been duly registered within a reasonable time after being executed, then his adverse possession of the land could be claimed as their adverse possession by his vendees, but not so where there is a failure to file the deeds for record within a reasonable time." What is a reasonable time may under certain circumstances become a question of fact, and proper to be submitted to a jury for its finding.

[10] The complaint is only made of the nonregistration of three conveyances: M. T. Taylor to J. C. Taylor, deed dated September 19, 1909, filed for record October 26, 1900; J. C. Taylor to Ella G. Taylor, dated September 20, 1900, filed for record October 26, 1900; E. G. Taylor and J. S. Taylor to Max Deutz, dated May 20, 1904, filed for record June 6, 1904; E. G. Taylor and J. S. Taylor to M. A. Haas, dated August 16, 1904, filed for record November 3, 1904. In the Cocke Case, supra, Cocke, notwithstanding he had, by his deed, parted with his title for a period of two years, he, nevertheless, asserted that he was "claiming it as his property." The evidence introduced as to the adverse possession is that W. J. Thornton testified he inclosed the land with a three inch wire fence, commenced using the Cummings survey for raising and grazing cattle in 1881 or 1882, and continued to use it until 1890, when he sold it to San Antonio National Bank. Received possession from Cavender; inclosed all land, including Cummings'. Improvements were pole and wire fences, used to keep his cattle in and others out. G. T. Thornton received land and personal property for the S. A. National Bank. George W. Brackenridge testified, as president of the bank, he sold and conveyed the cattle and horses to Jesse H. Presnall and J. R. Blocker, and leased them the Cummings survey, and the stock were never removed from the pasture until sold by them.

Jesse H. Presnall testified he continued to ranch cattle on Thornton ranch from February, 1891; until fall of 1894 was associated with John Blocker; had a verbal lease to entire ranch, and Mr. H. E. Johnson was for a time in charge of the cattle and resided on the ranch; afterwards, a man by the name of Langford was the foreman and resided on the ranch in charge of the cattle. The bank was in possession and control when they purchased. When they quit, there was a remnant of cattle they sold to Mr. Ed. English, and ceased to occupy in fall of 1894.

George W. Cavender testified he bought the land from W. L. McCaleb, used it as a pasture from 1888 to 1892. Inclosed with other tracts, it grazed about 600 head of cattle. He occupied it four years. He sold Cummings to W. J. Thornton & Co. in 1892.

Ed. English testified he rented and ran his cattle on it for about a year and a half in about 1894–1895, with 500 or 600 head. The river was one of the boundaries which was not fenced on the east side; rented from San Antonio National Bank on written lease. There was a fence on the west side of the river opposite the pasture.

A. Petry stated the Thorntons, the San Antonio National Bank "(by me)," Presnall, and Blocker and Ed. English occupied pature at different times for raising and grazing cattle. Stayed there from 1882 to 1894. The whole pasture, inclosed by wooden fence, which included the Cummings survey, was torn down by us in 1885 or 1886, and, after that, all that part was open country, and there were no fences clear out to Frio county. "We fenced the ranch, which included the Cummings survey, in 1892, with a wire fence. * * * The east string of fence belonged to the New York & Texas Company. The Cross S. Ranch owned the north fence. The Thornton lands, including the Cummings, embraced about 1,800 acres in all. The Cavender fence was the south fence of the Thornton pasture."

W. H. Eardley testified he had stock in the old Thornton pasture "immediately after English occupied it, and continued to use it until year before last, and except that part not sold. The John Cummings survey lies somewhere in the lower end of it. A crossfence was built in the lower end of the pas-

ture by J. S. Taylor, running out from the river and making several corners and connected onto the Thornton or old Cavender pasture. We had control of all the pastures until this cross-fence was built, but did not of that part cut off on the south side, which is the Cummings survey. "There was a corral about 100 feet square in the southern part of (Thornton) pasture, used to pen stock when we worked that part of pasture —don't know whether it was on Cummings survey or not."

Sam English stated he was a son of Ed. English, ranched with his brother on Thornton pasture 1894–1895; put a corral 100 x100 feet square in 1894 for branding, gathering, and holding cattle; had 600 or 700 head of cattle, and 30 or 40 head of horses. Cavender had cattle there same time.

F. Vandervoort stated he was agent of San Antonio National Bank in 1893 up to and including date they sold the Cummings survey to M. T. Taylor, and rendered same for, and regularly paid taxes from, 1893 to 1898; leased Thornton pasture, which included Cummings, after Presnall and Blocker left. The first lease was to Ed. English. After Presnall and Blocker's lease had expired, the entire pasture was unleased for some time, and G. W. Cavender wanted to lease the Cummings and Dillard tracts which lie adjoining in the south part of the pasture, which he did. The lease was made in writing for one year with privilege of another year. His last year expired October 8, 1897. Then it was leased to H. Howell, in writing, one year. He got sick and transferred lease to Eardley December 27, 1897. The balance was by him leased to Ed. English—all leased from year to year. Eardley then bought lease for raising and grazing cattle, and used it ever since; that is, part not sold. Taxes paid from 1892 to 1904, inclusive. Neither Dunn nor Tackaberry paid any taxes.

After Cavender went out, Eardley had whole pasture leased, after he secured the Howell lease. "I now think (after Presnall and Blocker went out) the vacancy was not so great as I (on former trials) testified, because in reading the deed from Thornton to the bank I see that the bank assumed payment of certain rents. The books showed I did not collect rents from 1893 to 1897. There was a break for a while, but cannot state how long. Eardley bought up the English lease, perhaps six months before it expired, and moved his cattle in the pasture."

J. S. Taylor testified: M. T. Taylor was living with him when lease contract was made with Wm. George. Cummings survey, Dillard, Bond, and Campbell surveys were fenced separately April, 1899. On that date George entered in lease contract. The surveys were inclosed by the Cavender fence on the south. The east and north fences he built. Eardley had Cummings leased to

February, 1898, when conveyed by San Antonio National Bank to M. T. Taylor. It then had a corral on the eastern end of it, appeared old. Wm. George remained there four years, using for hay pasture, and left April 1, 1901. After George left, he used pasture until the Cummings was sold to the Nueces Valley Irrigation Company (dated July 1, 1903, filed for record July 13, 1903) used it to pasture horses and cattle. The surveys were under fence and still under fence. "All the conveyances we made the land (permitted) remained continuously in my general inclosure, and, when not fenced, a part have been used for stock purposes. After Carr conveyed to Earnest, I rented a couple of years, but have had nothing to do with it since."

Albert Eardley testified that he leased the Thornton pasture. First control he had of Cummings was 29th of December, 1897; continuously had control of the surveys in said pasture up to the time they were successively sold. Howell lived with his uncle, J. S. Taylor, on the Campbell survey.

The evidence showed one side of the Thornton ranch to lie on the Nueces river; entire pasture fenced, except east bank of river was not fenced; just opposite to the south end of the string of pasture on the river 30 or 40 yards perhaps to the Blas Reyes fence. The Blas Reyes fence extended north to the Cross S. fence on the west side of the river. Cross S. fence crossed the river, and ran out from the river on both sides. At Presidio crossing on the north was strung wire across the river, and brush cut down and thrown in to prevent cattle passing out; did same thing at lower end of pasture to prevent going out there. Cattle did and could cross the river, but the Blas Reyes fence along west side of the river prevented them from escaping.

The only question made as to the conveyances under which appellees claim title as not sufficient for the purpose of supporting the limitation defense is as to the dates and delay in registering the conveyances as above shown; but, if sufficient, then the defendants have shown their claim under deeds duly registered and payment of all taxes for the requisite period of time, and we so hold. The testimony as to length of time it was not used after Presnall left is not as it was on former trial, in that it has been supplied by the proof and by the possession also of English whose possession under the lease began before Presnall vacated. We also believe that the verdict is supported by some evidence of the continuous adverse possession, use, and occupation of the premises for a period of more than five years. In considering the evidence as a whole, and which we have gone to the pains to set out, it will be seen there is evidence from which the jury may have found either way.

We have considered well the criticism of

the testimony, and seeming inconsistencies about breaks in the possession after Presnall's lapse expired, and what Vandervoort said about lapse in payment of rent, and all other claimed breaks in the possession. The jury could very reasonably conclude that English had leased the pasture six months before Presnall's lease expired, as he purchased the remnant of cattle, and was in joint possession with Presnall under the true owner. These several purchasers and tenants sometimes held jointly and sometimes in severalty, and may be said always in subordination in privity with and under those with whom the appellees' title connect.

[11] It is urged that the Blas Reyes fence on the opposite side of the river 30 or 40 yards out was not a sufficient barrier. We cannot see why under the five years possession with deeds defining the boundaries of the surveys that a fence or barrier or inclosure that embraces more of the land than the field notes call for used as boundary fence by permission or otherwise sufficient to hold the stock is not a sufficient possession of the tract, in the absence of some adverse possession of a part in some one else asserting a superior title. As this same contention, practically, was before the Supreme Court on the former appeal and not sustained, we overrule appellants' assignment.

[12] The tenth assignment complains that the verdict was defective in not disposing of Dunlap, Keith, Cunningham, and Carroll, because the court directed a verdict. There was no error for that reason, because the charge of the court and the judgment of the court eliminates them entirely from the case.

We have carefully considered all the assignments presented and urged in appellants' brief and feel constrained to overrule them.

From what we have said, the judgment of the district court will therefore be affirmed.