**PEVETO et al. v. HERRING.**

No. 4373.

Court of Civil Appeals of Texas. Beaumont.

Nov. 19, 1946.

various improvements, to-wit, wells, out-buildings and fences.

The cause was tried to a jury. The jury were unable to agree upon a verdict, and the trial court discharged them; and subsequently, upon plaintiff's motion, without having declared a mistrial, rendered judgment in plaintiff's favor against the various defendants for the land as prayed for by him, excepting, however, various townsite lots, several hundred in number, conveyed out of this tract to other persons by plaintiff's predecessor in title, the Gratis Townsite Land & Development Company.

Charles and Edmond Peveto have appealed, and under Point 1 assign error to the trial court's judgment on the ground that it was an issue for the jury on this record whether they had title to the land under the 10 year statute of limitations, and that the trial court accordingly had no authority to render judgment on the merits after the jury were discharged.

It may be assumed that the trial court had power to render the judgment which was rendered here if the evidence would support an instructed verdict in plaintiff's behalf. Slay v. Burnett Trust, 143 Tex. 621, 187 S.W.2d 377, at page 384. And see: Clark v. Jones, Tex.Civ.App., 164 S.W.2d 62; First Nat. Bank v. Corbin, Tex.Civ.App., 153 S.W.2d 979; Fitts v. Carpenter, Tex.Civ.App., 124 S.W.2d 420. However, plaintiff's right to an instructed verdict was a prerequisite to such a judgment, and we are of the opinion that Charles and Edmond Peveto raised the issue for the jury that they had limitation title under the 10 year statute to that part of the land within their fence lines, or to some parts of the land, (which need not be identified) even under Article 5511. There was evidence of the following matters.

The land for which plaintiff sued and to which he proved a title was a part of a 454 acre tract in the southwestern portion of the William Clark survey, which Samuel C. Linebarger and his sons, C. C., F. W., and C. W. Linebarger, conveyed on October 4, 1909, to the Gratis Townsite Land & Development Company. The conveyance vested the grantee with title to said land. We

V. H. Stark, of Orange, and D. E. O'Fiel, of Beaumont, for appellants.

Homer E. Stephenson and J. T. Adams, both of Orange, for appellee.

WALKER, Justice.

H. P. Herring brought this action in trespass to try title on May 10, 1945, against Charles and Edmond Peveto, and against Vernon W. Peveto, their brother, to recover title to and possession of a tract of land in the William Clark survey, in Orange County. Plaintiff alleged that this tract contained 145.37 acres, more or less.

Vernon W. Peveto filed a disclaimer by way of answer. Charles and Edmond Peveto, among other matters, pleaded not guilty and the ten year statute of limitations as matter in bar of plaintiff's suit, and further, that under the ten year statute they had title to 160 acres of land, either out of a larger tract of which the land in suit was a part, or out of the very land for which plaintiff sued if said land covered more than 160 acres, and that this 160 acres should be set aside to them so as to include

note that a small fraction of the land for which plaintiff sued fell outside of this tract. The Townsite Company was apparently a partnership composed of Samuel C. Linebarger and his sons, C. C. and F. W. Linebarger; they subdivided the 454 acre tract into the townsite of Gratis, consisting of 227 blocks divided by streets and avenues 40 feet wide, a 20 acre "oil reserve", and a 1-acre "club house reserve." A "full block" contained 18 lots and a "full lot" measured 30 feet in width by 120 feet in length, and most of the lots and blocks in this subdivision were of this description. Plats delineating the townsite were recorded in the deed records of Orange county, the last, apparently on January 1, 1910, and copies of these plats are before us. A railroad running on a course approximately northwest and southeast passed diagonally through the townsite, leaving perhaps one-third thereof on the east; the land in suit lies east of and abuts upon this railroad right-of-way.

Evidently great numbers of these townsite lots were conveyed by the Townsite Company to persons who resided beyond the limits of Orange county. Defendants proved conveyances of several hundred townsite lots out of the land in suit, (although only the date of one conveyance appears in the evidence) leaving unsold numerous distinct and segregated fragments of the original townsite which vested in the plaintiff under the conveyance now to be mentioned.

On February 24, 1911, S. C. Linebarger conveyed to his associates, C. C. and F. W. Linebarger his interest in the property owned by the Gratis Townsite Land & Development Company; and on March 24, 1945, C. C. and F. W. Linebarger, joined by their wives, conveyed to plaintiff by a quitclaim deed whatever interest they had in the townsite of Gratis.

The foregoing constitutes plaintiff's proof of title to the land for which he sued. As stated, the trial court excepted from the judgment various townsite lots conveyed before the date of plaintiff's deed, and, also as stated, some of the land for which plaintiff sued fell outside of the townsite,

to which his base record title was limited. A few scattered families now reside on the Gratis townsite but apparently no town has ever existed there.

The land in suit forms an irregularly shaped tract which need not be accurately described. A small part lies outside of the townsite of Gratis on the north and a somewhat larger part lies outside the townsite on the south. According to the map attached to appellants' supplemental brief, which will do well enough here, the western boundary of the land for which plaintiff sued is approximately 1880 feet long and runs along the eastern line of the railroad right-of-way. From this the south line runs in an easterly direction some 3300 feet. The first course in the north boundary from the railroad is north 86½ degrees east 984 feet; the boundary then turns in a northerly direction along a series of irregular courses for some 700 feet, and then runs off toward the east along irregular courses for perhaps 1500 feet until it intersects the eastern boundary, which comes up from the south along northwesterly courses. The eastern boundary extends perhaps 2500 feet.

Appellants' old fence lines coincide substantially with the western boundary and the westernmost 984 feet of the north boundary, but lie somewhat to the south of the balance of the north line and a short distance to the west of the eastern boundary. The variance, however, is not material under our judgment; there is evidence locating appellants' lines. A fence now runs along the south which coincides substantially with the southern boundary of the land, but this fence was erected a year or perhaps a year and a half before this suit was filed. Before this southern fence was erected, appellants' enclosure extended still farther to the south, apparently down to the southern boundary of the William Clark league; and the location of this old fence has not been proved. However, this is also immaterial; there is evidence that appellants' actual possession and claim covered the land in suit. The western 32 acres of the land has been segregated for many years by a cross fence.

One Asa Noguess farmed the land, or a part of it, in 1925 as a tenant of plaintiff's predecessors in title. After the close of that season, in 1926 or perhaps in 1927, Charles and Edmond Peveto took possession of the land within the larger enclosure to which we have referred above, as a pasture for their cattle, and thereafter held and used it, under fence, for that purpose, under circumstances which raise the issue that they had acquired limitation title to that part of the land in suit, within their fence lines or to at least some parts of it even under Article 5511, against plaintiff's grantors prior to the date of plaintiff's conveyance. The following elements of the proof will be discussed.

■ (1) Charles and Edmond Peveto took, and have since held possession as trespassers, intending to acquire title jointly under the statutes of limitations to a specific 160 acres of land, without muniment of title. Their possession and their claim were joint, and were analogous to that of tenants in common under a deed. The evidence does not show what their respective interests in the 160 acres acquired were to be. Such possession and claim were sufficient to vest title under the 10 year statute, Article 5510, if other requirements of that statute were met. Gribble v. Call, Tex.Civ.App., 123 S.W.2d 711; Reyes v. Flores, Tex.Civ.App., 62 S.W.2d 679; Davis v. Dowlen, Tex.Civ. App., 136 S.W.2d 900, a case involving such possession and claim, where this court, at page 905, said: "Moreover, the issue of ten year limitation was submitted without reference to any muniment of title, there being only 10 acres of land involved, adverse holding under muniment of title was not involved, and the issue was submitted simply on adverse peaceable possession, and use and enjoyment of the land for ten consecutive years before the filing of the suit. The finding on this issue, alone, supports the judgment" (in behalf of the limitation claimants). This result seems to follow from Appel v. Childress, 53 Tex. Civ.App. 607, 116 S.W. 129 and Myers v. Frey, 102 Tex. 527, 119 S.W. 1142, Frey v. Myers, Tex.Civ.App., 113 S.W. 592. Such a conclusion accords with decisions giving effect to joint possession and claim under a recorded deed by tenants in common, and to joint possession and claim by husband and wife.

(2) Plaintiff has made some point of various matters affecting the continuity and exclusiveness of appellants' possession of the land.

(a) Plaintiff says that Charles and Edmond Peveto were absent from Orange county during extensive periods. However, there is evidence tending to show that such absences as occurred did not break the continuity of appellants' possession.

The evidence does not show that anyone has ever resided on the land. From 1918 until appellants took possession in 1926 or 1927, the land was farmed or used for a pasture, and it has only been used for pasturage since the time last mentioned.

■ Edmond Peveto resided out of Orange county from 1920 to 1936; but he said that he returned to Orange county two or three times each year and that he contributed to the payment of certain expenses which were incidental to appellants' use of the land. It is a fair inference that he gave his property some attention during his trips to Orange county; he said: "I did not have a whole lot to do with the land, only when I came down there." His testimony raised the issue that during his absence his father or his coclaimant, Charles Peveto, attended to the cattle and to the pasture in his behalf and in behalf of the said Charles. He could, of course, hold possession by an agent. Huff v. Crawford, 88 Tex. 368, 30 S.W. 546, 31 S.W. 614, 53 Am.St.Rep. 763. And the possession of his coclaimant, acting in his behalf, inured to his benefit, as previously stated.

Charles Peveto refers to no agent and his testimony leaves the impression that he had charge of and that he attended to the prosecution of his and his brother's enterprise He is a school teacher; he said that he had followed this vocation in Orange county during the past 15 years. His wife testified that they were married in Fort Worth during 1929, and that her husband resided in Orange county before their marriage and that they moved to Orange county during the latter part of 1929 or early in 1930

and had resided there since. The home of her husband's parents was on land adjacent on the southeast to the land in suit, and during the first three years of their marriage she and her husband resided with the elder Pevetos, or on their home tract. They had since resided at two other places in the county which were evidently at some distance from the land. She was also a school teacher and apparently taught in the same school in which her husband taught. She said that her husband had worked at an oil refinery at Houston for a few months during 1943 or 1944 but that he returned on week ends and maintained his home in Orange county as before.

There is testimony from other witnesses raising the issue that appellants were known by the surrounding community throughout the limitation period to be in possession of the land; and that their possession was respected by the community and their consent requested by adjacent residents to use the pasture. There is also evidence that appellants' claim to the land was known during this period.

The absence of Charles and Edmond from the county, and their residence away from the land were only evidentiary matters in any event; and under the circumstances related, the issue of continuity was for the jury to decide.

■ (b) From time to time other persons than appellants have used the land for pasturage. However there is evidence in the record from which it could be inferred that such use was made with appellants' consent. Use by others in subordination to appellants' claim did not affect the exclusiveness of appellants' possession. Petty v. Griffin, Tex.Civ.App., 241 S.W. 252; Houston Oil Co. v. Stepney, Tex.Civ.App.,. 187 S.W. 1078. Casual entry by trespassers, as Allen Capps seems to have been, which did not amount to dispossession and which were not acquiesced in by appellants did not affect the exclusiveness of appellants' possession. Glover v. Pfeuffer, Tex.Civ.App., 163 S.W. 984; Word v. Colley, Tex.Civ. App., 173 S.W. 629. Nor would similar entries by persons who purported to act with the consent of plaintiff's grantors. Cobb v. Robertson, 99 Tex. 138, 86 S.W.

746, 87 S.W. 1148, 122 Am.St.Rep. 609; Cochran v. Moerer, 47 Tex.Civ.App. 372, 105 S.W. 1138.

■ (c) We note that a canal and a pipe line have been run through this tract since the appellants' possession originated. The canal was made about 1936; the evidence does not show when the pipe line was laid down, nor does it show the title or right under which these improvements were made, or who owns or claims them. However, neither improvement has interfered with appellants' possession or use of the land or with the effectiveness of their enclosure; and therefore has not affected the exclusiveness of appellants' possession. Possession may be exclusive, although others than the owner of the land in suit use a pasture jointly with the claimant. Burnham v. Hardy Oil Co., 108 Tex. 555, 195 S.W. 1139, Tex.Civ.App., 147 S.W. 330; Alley v. Bailey, Tex.Civ.App., 47 S.W. 821.

■ (d) Plaintiff refers to evidence showing an entry under his grantors for the purpose of cutting and removing timber. However, without regard to the legal effect of this entry, there was also evidence that this entry occurred and that the timber was removed prior to 1930; and well over ten years elapsed thereafter prior to the filing of this suit on May 10, 1945. Plaintiff also says that Vernon Peveto, appellants' brother and a defendant below, was the tenant of his grantors under a two year lease covering this land, dated September 16, 1929; and that the said Vernon, acting under this lease, used the land in common with appellants, or that Vernon controlled the land as appellants' agent. However, there is testimony in the record from Charles and Edmond Peveto that Vernon Peveto had no connection with their possession or their use or their claim to the land and that he did not use the land. The credibility of appellants was a matter for the jury to decide. Plaintiff also refers to the fact that a fence was erected along the south boundary of the land a year or so, perhaps a year and a half before trial of this cause, by Johnny Womack (or Frank Meshell) which reduced the appellants' enclosure to substantially the land involved in this suit, and that the appellants did not object. This matter

may have some evidentiary value respecting the nature of appellants' claim but it could not have affected any other issue; erection of the fence did not dispossess the appellants from any of the land involved in this suit. Plaintiff also says that after conveyance was made to him the appellants, at his request, moved their cattle from the land. Appellants deny this, and thus, raise an issue of fact; but the matter is wholly immaterial since title had vested in appellants, if at all, before the date of plaintiff's deed.

(3) Plaintiff says that appellants did not build the fences enclosing their pasture, and for this reason says that appellants' possession was not exclusive. The point made, however, seems to be involved in the question, whether appellants' possession and use of the land were sufficient to give notice to the owner of appellants' adverse claim to the land; and on the record before us this question was for the jury to decide.

The land was fenced when appellants first took possession thereof. Plaintiff's predecessors in title either erected or re-erected the fences along the north and east. A substantial part, perhaps most, of the fence originally along the south consisted of fences belonging to, and erected by Johnny Womack and by appellants' father for the purpose of enclosing their own lands. Asa Noguess seems to have erected the cross fence enclosing the western 32 acres while he was in possession before appellants' entry. The evidence does not show with certainty who erected the fence along the railroad, but if plaintiff's predecessors did not, then it may be assumed that the railroad company did.

There was evidence that appellants repaired the outer fences when they took possession and that the repairs were substantial. Charles Peveto said: "We moved in and found those fences and used them as our own and kept them repaired. We established some of those fence lines; they was up; they was there. Perhaps I misunderstood your meaning of establish. I built the fences on the north and east side— repaired them. I repaired those fences in 1927 when I moved there." Testimony is in the record tending to show that the outer fences were thereafter maintained by appellants during an indefinite period running up, at least, to about the time the suit was filed. We note that the land was used as a pasture after it was conveyed to plaintiff by deed dated March 24, 1945. Charles Peveto said the north fences were kept up for approximately 18 years, and it is a reasonable inference that the maintenance of the balance of the enclosure extended throughout the same period. The cross fence was also maintained throughout this period but at some unstated time was allowed to fall down and to remain down, according to Edmond Peveto, for a year or two, and during this period the western 32 acres was thrown into the larger enclosure.

Charles Peveto said that the fence on the north was taken down in 1930, "part of it in 1931 or 1932", and rebuilt at another place, evidently the north fence line located and described by appellants' witnesses Johnny Noguess and J. L. Tanner. The removal and reerection of this fence is a significant fact; and if no special effect is to be given the substantial repairs originally made by appellants, then it may be of importance to note here that there is evidence of possession by appellants for a full ten year term after 1932. As stated above, it is a reasonable inference that appellants maintained the fences during the 18 year term that Charles Peveto said they maintained the north fence and this would bring the maintenance of the fences and thus, the possession of appellants down to 1944 or 1945.

According to appellants, the use made of these fences, the maintenance and repair thereof, and the changes made therein were as much a trespass as the appellants' use and possession of the land.

There is ample testimony that appellants, and several other persons in subordination of their claim, have used this land as a pasture for their cattle from the time appellants took possession in 1926 or 1927 down to the date of trial.

The question here, as indicated above, is whether appellants' use of the property conveyed notice that it was adverse to the owner. Since the land was used only for pasture, and since no improvements of any kind except fencing have been proven, appellants had to prove the existence of an enclosure during the limitation period on

which they rely. De Las Fuentes v. Macdonell, 85 Tex. 132, 20 S.W. 43; Allison v. Groppenbacher, Tex.Civ.App., 142 S.W.2d 528.

The substantial repairs originally made upon, and the continuous maintenance of these extensive fences, including the cross fence, by trespassers, and the removal by said trespassers from its original line and their reerection of the north fence, when considered with the continuous use of the land by said trespassers, to-wit, appellants and by other members of the surrounding community in subordination to the claim of appellants, from 1926 or 1927 until this suit was filed on May 10, 1945, was substantially equivalent to such use within such an enclosure erected by a limitation claimant; and such use within such an enclosure is sufficient to convey notice of adverse claim to the land. The circumstances noted in the following decisions are in accord, more or less, with those exhibited by this record: Pierson v. McClintock, 34 Tex.Civ.App. 360, 78 S.W. 706; Vineyard v. Brundrett, 17 Tex.Civ.App. 147, 42 S.W. 232, where the court (page 234) refers to the fact that no change in the fence lines had been proven; Dunn v. Taylor, Tex. Civ.App., 107 S.W. 952, 102 Tex. 80, 113 S.W. 265; Houston Oil Co. v. Skeeler, Tex.Civ.App., 178 S.W.2d 740; Loring v. Jackson, 43 Tex.Civ.App. 306, 95 S.W. 19, where the court referred to pasturage of cattle as a circumstance having some significance (on that record) when considered with the enclosure.

The fact that fences belonging to other persons, which were erected to enclose other land, were used as a part of the enclosure along the south and perhaps along the western boundaries of the land was at most only a circumstance bearing upon the character of the notice given by appellants' use of the land, and did not prove, as a matter of law, that appellants' possession was insufficient to convey notice of appellants' adverse claim or that said possession was not exclusive. Caver v. Liverman, 143 Tex. 359, 185 S.W.2d 417; League v. Buena Ventura Stock Co., 2 Tex.Civ.App. 448, 21 S.W. 307; Alley v. Bailey, Tex.Civ. App., 47 S.W. 821; Cook's Hereford Cattle Co. v. Barnhart, Tex.Civ.App., 147 S.W. 662; Wingfield v. Smith, Tex.Civ.App., 241 S.W. 531; Dunn v. Taylor, Tex.Civ. App., 107 S.W. 952, 102 Tex. 80, 113 S.W. 265.

The facts before the court in West Production Co. v. Kahanek, 132 Tex. 153, 121 S.W.2d 328, and Whitaker v. Felts, 137 Tex. 578, 155 S.W.2d 604, are distinguishable from the facts now before us.

(4) Plaintiff refers to the testimony of Edmond Peveto respecting the location of the south boundary of the 160 acres claimed by appellants. This testimony, with that of Asa Noguess and others, when considered with the various plats before us, tends to prove that until a year, or perhaps a year and a half before this suit was tried, (when Johnnie Womack or Frank Meshell erected the present fence along the south line of the land in suit) the appellants' enclosure extended down to the south line of the William Clark league and included more than 160 acres. However, the testimony of Charles and Edmond Peveto shows that they only claimed 160 acres, and as we construe their testimony, this testimony raised the issue for the jury that they claimed the north 160 acres within their enclosure, on which, or along the boundaries whereof, were located such improvements as they "erected", namely, various fences, including the cross fence segregating the western 32 acres; and this particular 160 acres covered the land in suit. Although Charles Peveto does not refer to the matter, Edmond Peveto says that he did not know where the south line of the 160 acres fell. It may be that there are some contradictions among the testimony of Edmond Peveto, but there was evidence that appellants knew where their fences were and thus, where the western, northern and eastern boundaries of their land were located. It is thus a reasonable inference that appellants did have some rough or approximate notion of where their south line would fall.

There is evidence showing that for a year or so the cross fence segregating the western 32 acres from the balance of the appellants' enclosure was down, but when this occurred was not proven. Charles Peveto also referred to a smaller enclosure

adjoining this cross fence on the northeast, but he never did show when possession was taken of this smaller enclosure nor did he locate it on the ground except approximately, by marking it on one of the plats introduced in evidence. The only record title proven to lands of which appellants had possession is limited to townsite lands which fell within the 160 acres claimed by appellants; about all we can say regarding the balance of appellants' enclosure, as it originally existed and as it was reduced by the Womack-Meshell fence on the south, is that it has been patented by the State. It does not appear that plaintiff's grantors, whose title originated before appellants' occupancy began, or the plaintiff himself owned any land in appellants' enclosure other than townsite land. The question is thus raised, whether appellants' failure to locate or to designate their south line on the ground, or to know where that line would fall, is of any significance here.

■ We think it immaterial whether appellants located or designated the south line of their 160 acres or knew where it would lie. Appellants have been in actual (not constructive) possession of all of the land within their enclosure as it originally existed and as it was reduced by the Womack-Meshell fence. The enclosure and the use made of the land by appellants gave the owner of the land notice of appellants' adverse claim, and the owner was thus put on notice of the acreage covered by appellants' claim within the enclosure, precisely as if appellants had held possession under a registered muniment of title. We note a holding that the extension of the enclosure beyond the limits marked in a recorded deed did not effect the operation of the statute. Dunn v. Taylor, Tex.Civ. App., 143 S.W. 311, page 317 (par. 11); motion for rehearing granted on other grounds, Tex.Civ.App., 147 S.W. 287. This result is consistent with the rule laid down in Smith. v. Jones, 103 Tex. 632, 132 S.W. 469, 31 L.R.A.,N.S., 153, that possession need not always be adverse to the entire world provided it be so against the owner of the land, and with the decisions hereinbefore mentioned, that one who excludes the owner of a tract may use the pasture jointly with others using other tracts within the common enclosure. The same result has been reached under the 10 year statute where the claimant undertook to mark off on the ground the limits of a specific 160 acre tract claimed by him out of a larger tract of which he did not hold actual possession. Vann v. Denson, 56 Tex.Civ.App. 220, 120 S.W. 1020, where the claimant, by mistake, included more than 160 acres within his lines; Thompson Bros. Lbr. Co. v. Williamson, Tex.Civ.App., 177 S.W. 987, where the claimant's knowledge of the boundaries of her tract was not exact. ("She knew about where the boundaries of the 160 acres were by the boundaries of surrounding tracts of land.")

■ Appellants' restriction of claim is only significant as it may affect the exclusiveness of their possession, and it could not have that result unless plaintiff's grantors (whose record title antedated appellants' possession) had owned some land within appellants' enclosure but outside of the 160 acres claimed by appellants; and there is nothing to show whether they did or did not. If such facts would avoid appellants' plea of limitation title, we think the burden rests on plaintiff to prove the same, somewhat as the burden rests on him to bring forward matter in avoidance under Arts. 5511 and 5512. Huling v. Moore, Tex.Civ. App., 194 S.W. 188, page 192 (par. 13, 14). Otherwise the limitation claimant might have to prove the title to all of the land within his enclosure except the very land to which plaintiff has shown record title in himself. Such facts seem to be true matter in avoidance and not elements of a limitation claimants' case, especially when it is remembered that the claimant's possession may be exclusive although he uses an enclosed pasture in common with other owners of land other than of the land in suit. Therefore the only effect to be given by us on this appeal to appellants' claim to a specific 160 acres out of the larger tract within their original enclosure is by way of limiting their acquisition of title to the very 160 acres claimed by them, somewhat as would have occurred under the 5 years statute if they had held possession under a recorded deed which conveyed only an un-

divided interest. Martinez v. Bruni, Tex. Com.App., 235 S.W. 549. We note that a similar result was reached under the 10 year statute in: Price v. Eardley, 34 Tex.Civ. App. 60, 77 S.W. 416, and Collins v. Page, Tex.Civ.App., 129 S.W.2d 335. This result will not offset our judgment because the 160 acres referred to covered the land in suit.

We are inclined to think that the parties tried this case upon a different theory than we have in mind. There is evidence in the record that the particular 160 acres claimed by appellants was similar in quality and value to adjoining lands. Doubtless this testimony, with the facts showing the improvements erected by appellants to be on the northern, or along the boundaries of the northern, 160 acres, were elements of a case which if completely made out against all interested parties would have entitled appellants to have the north 160 acres of their original enclosure set aside to them, but it is apparent from this record that if the facts are fully developed, the 160 acre provision of Art. 5510 will have no application; there is, in all probability, a multitude of distinct and separate ownerships located within the limits of the land in suit and within appellants' original enclosure. Such proof may invoke the provisions of Art. 5511 but we are not to be understood as having expressed any opinion on the applicability of that statute.

(5) Plaintiff refers to certain testimony of Edmond Peveto which tends to show that Edmond's claim was secret.

Edmond Peveto's testimony raised the issue for the jury that his possession was open and adverse and that such use as he made of the land was unconcealed and exclusive. On direct examination he testified:

"Q. Now, what did you do in the way of making claim to the land, Mr. Peveto? A. Oh, outside of just—had it in peaceable possession—anybody talking about it, why, 'Yes, I am going to claim it; whenever limitation comes on long enough to, I will have a claim.'

"Q. You meant you had a limitation claim? That was right? A. Yes, sir.

"Q. Do you not mean you went on the land with the intention of acquiring title to it by limitation:

"By Mr. Stephenson: We object to that.

"By the Court: Gentlemen, don't give any consideration to that. Let the witness testify.

"Q. With reference to that, just tell the jury. A. Well, that was the intention, Judge, whenever we kept the pasture up on it, because we used it for that purpose. * * *

"Q. Now, what steps did you take, if any, to proclaim to the world the fact you were in possession of the land and were claiming it? What did you do? A. Well, outside of just occupying it and keeping up the fences, if anybody asked me about it, I told them. I wouldn't recall anyone now I told. We talked about it together, Charles and I, but outside of any certain person—

"Q. You know of the Linebargers? A. Yes, sir. I have never been disturbed in my possession by the Linebargers or anyone for the Linebargers. No one has challenged our possession until this suit was filed."

He testified on cross examination:

"Charles Linebarger sold that timber off of that land. We did not make any objection or try to recover any money, because at that time I didn't have a claim to it; I had a claim in a way, but I didn't have a claim enough to establish in full; you couldn't take two or three years and go to Court with a claim onto it. I had as much claim to the land as Linebarger did. I didn't try to recover any money. I knew they were cutting the timber and didn't make any effort to stop it. I didn't go to the people and tell them they were cutting timber on my land because I don't know if I know who owned it. I knew who bought the timber. Peavy-Moore Lumber Company bought the timber; they refused to buy it, but he went back with the abstract and sold the timber on 232 acres, but he come back and cut the timber off the land I claim. Linebarger didn't sell that timber; they bought what was in the abstract, but he cut off the Townsite tract. I didn't go tell Linebarger to stop cutting that timber; it wasn't mine.

* * * (As previously stated, there is evidence that this timber cutting occurred before 1930.) * * * I don't remember any particular person I ever told I was claiming this except Charles Peveto. I don't remember any specific person I told I was claiming this land.

"Q. Never during 1927 to 1945 did you tell anybody you can remember you were claiming this land; is that right? A. You know, Homer, I found out a long time ago the less the other fellow know about what you are doing the better off you were.

"Q. So, you didn't want to tell anybody you were claiming this land? A. That is right, until I got to where I could prove mine.

"Q. So, during the ten years you were not going to say anything about claiming it? A. That is right. I didn't pay any taxes during that period. I never rendered it for taxation."

On redirect examination he testified:

"If anybody ever asked me if I was claiming this land I don't remember it; they wouldn't have got told if they had. I don't recall anybody that ever asked me if I was claiming that land."

However, Charles Peveto said: "I have had possession of that tract of land about— well, since 1927. That possession has been in company with my brother, Edmond Peveto, who is the same Edmond Peveto that is a party defendant with me in this suit." He testified further:

"Q. Now, when you folks—when you and your brother, you say, took possession of this land, what did you do with respect to claiming it?

"By Mr. Adams: We object. Pardon me. Your Honor, he said what did he do with respect to claiming it.

"By the Court: Are you objecting to that question?

"By Mr. Adams: Yes, sir.

"By the Court: The objection is overruled.

"Q. Did you or not claim the land when you entered into possession, Mr. Peveto? A. We did. We have been in possession of that land since that time up until suit was filed and we are now in possession of it. We have claimed to own the land ever since these enclosures were first made."

He testified that he told several people he was claiming the land, and said: "If anybody ever asked me about what right I had to the land I told them. If anybody ever asked me about my right to the land, I have told everybody that ever asked me that I was claiming the land."

Asa Noguess knew of appellants' claim He testified: "The first time I heard the expression 'limitation claim' used in point of time was right after I growed the last rice crop on it, which was in 1925." He also said: "I have heard Edmond Peveto say he was claiming that land as his own. It was sometime back when I heard Edmond say that; I don't know just how long ago. It would be hard to say how many years ago that was; it might have been four or five or six or eight. I have heard Edmond say he was claiming it as many as once or more times. I think I have heard him say he was claiming it more than once. It is hard to say how many more times I heard Edmond say that, but I have heard him say they was going to claim that part of the Gratis Townsite by limitation. Edmond said they were claiming it by limitation. That might have been five or six years ago or it might have been eight or ten years ago. I do not recall where I was, who was present or whether anybody else heard it. I have heard Charles say many times they was claiming it. I have heard Charles say many times they was claiming that pasture."

Johnney Noguess testified: "As to whether or not Edmond ever told me he was claiming title to that land:—I knew the set-up on it. I never heard Vernon mention that he had any interest in that land. If Vernon had had an interest in that land I believe he would have mentioned it. The set-up I mentioned was Edmond and Charlie having an interest in it. As far as I know it was just Edmond and Charles; they excluded Vernon."

Robert Walea testified: "I know the Peveto brothers, Edmond and Charles, claimed some of this land; they used it

for a pasture; I saw cows in there once in a while. I really don't know how long they have been claiming this land, but it has been about fifteen or twenty years, somewhere along there, within my knowledge.

A. B. Rosenbaum testified: "I have been on that land. I was first on this land about twelve years ago. I was working cattle out there with the Pevetoes is how I happened to go on the land at that time. Charles and Edmond were the Pevetoes that I was working with at that time, but I have rode with all of them. I was just working for these boys but I had a few head of cattle out there at one time. The first time I recall that I was on this land was about twelve years ago. Since that time I have had occasion to be on this land from time to time during the years. I would go on the land four or five times a year, I guess, during the last twelve years. I know Charles Peveto and I know Edmond Peveto. They have told me they was going to claim this land by limitation time and again when we would be in there working cattle and they would talk about it."

Mrs. Asa Noguess testified: "In regard to whether or not I remember when it was I heard Charles Peveto say he was claiming the land or where I was when I heard him say he was claiming it or who was present and under what circumstances it was said or the words he said:—that has been a long time ago. I couldn't tell you the last time I heard Charles Peveto say he was claiming the land, because I heard it a number of times. I do not remember any specific time. Usually there was several present when he said it; they were visiting. I couldn't recall now any certain ones that were there when Charles said that. I have heard Edmond Peveto say he was claiming this land. When people began to talk anything it is not hard to hear it. The two brothers are supposed to be claiming the land. All I have heard is that Edmond and Charles was going to claim that part of the land."

Mrs. Theda Peveto testified: "The conversation I had with Charles and Edmond Peveto about their ownership of this land or how they claimed it was just in general conversation, nothing specific directly to me. I wouldn't know whether they had a deed to it or not. The conversation I had with them, if any, about what their claim or ownership was, was just more or less a general understanding. I have heard them speak of that land as 'our pasture', but I couldn't repeat any direct conversation. I don't recall any direct talk I ever had with them about it. I just recall conversations they had in my presence and hearing when they talked of that land as their pasture."

It does not appear that Edmond Peveto ever denied that he was claiming the land.

■ Under the record presented, the rule of decision giving to the testimony of a party the effect of a judicial admission is not applicable. The testimony of Edmond Peveto, especially that given on a direct examination, raised the issue that his claim was not secret and that his claim met the requirements of Article 5510. The contradictory testimony given by Edmond Peveto on cross examination and on redirect examination only made the character of Edmond Peveto's claim an issue for the jury. Pearson v. Doherty, 143 Tex. 64, 183 S.W.2d 453; W. T. Carter & Bros. v. Richardson, Tex.Com.App., 236 S.W. 978. And see O'Meara v. Williams, Tex.Civ.App., 137 S.W.2d 66 generally, regarding Edmond Peveto's claim.

This disposes of such matters raised by the plaintiff as require discussion. Plaintiff invokes the doctrine of prior possession; but since the record title of plaintiff's grantors has not been disputed, this doctrine has no application.

The issue of limitation title being raised by the evidence in appellants' favor, the judgment of the trial court is reversed and the cause is remanded.